# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES MARSH, | CIVIL ACTION NO.:    2:20-cv-1145 |
|        Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| UNION RAILROAD COMPANY, LLC., TRANSTAR, LLC, UNITED STATES STEEL CORPORATION, SMART TRANSPORTATION DIVISION, JOEL HUDSON, JONATHAN CARNES, and MALISA SOMMERS | |
|        Defendants. | |

## COMPLAINT

Plaintiff Charles Marsh files this Complaint against Defendants Union Railroad Company, LLC; Transtar, LLC; United States Steel Corporation, and SMART Transportation Division, seeking damages for the discrimination he was subjected to at work and the unlawful termination of his employment.

## THE PARTIES

1.      Charles Marsh is an adult individual who resides at 120 Evergreen Road, Trafford, Pennsylvania 15085.

2.      Union Railroad Company, LLC ("Union Railroad") is a for-profit corporation incorporated under the laws of Delaware with corporate headquarters in Pittsburgh, Pennsylvania and principal place of business in Duquesne, Pennsylvania. Union Railroad is a rail transportation company that, at all relevant times, employed approximately 500 individuals and was the direct employer of Plaintiff.

3.      Transtar, LLC ("Transtar") is a for-profit corporation incorporated under the laws of Delaware with corporate headquarters and principal place of business in Pittsburgh, Pennsylvania.  Union Railroad is a wholly owned subsidiary of Transtar, an entity engaged in the business of transporting raw materials and finished products for a variety of industries.

4.      United States Steel Corporation ("U.S. Steel") is a for-profit corporation incorporated under the laws of Delaware with corporate headquarters and principal place of business in Pittsburgh, Pennsylvania. Union Railroad and Transtar are wholly owned subsidiaries of and operate in concert with U.S. Steel.

5.      Smart Transportation Division ("SMART TD" or "the Union"), is a non-profit corporation incorporated under the laws of Ohio with corporate headquarters in North Olmsted, Ohio.  SMART TD is a division of the Sheet Metal, Air, Rail and Transportation Union, the labor union that represented Plaintiff and other employees pursuant to a Collective Bargaining Agreement effective November 1, 1943 and last amended November 8, 2017.

6.      Joel Hudson is an adult individual who is currently employed as General Superintendent for three of Transtar's wholly owned subsidiaries: Union Railroad, Lake Terminal Railroad Company, and the Lorain Northern Company. On information and belief, Hudson resides at 2090 Majestic Drive, Canonsburg, Pennsylvania 15317.

7.      Jonathan Carnes is an adult individual who is currently employed by U.S. Steel in two capacities: Managing Director of U.S. Steel Logistics and General Manager of Transtar. On information and belief, Hudson resides at 207 Molly Drive, Canonsburg, Pennsylvania 15317.

8.      Malisa Sommers is an adult individual who is currently employed by U.S. Steel as Vice President of Process and Innovation. During the period of Marsh's claims, Sommers was employed by U.S. Steel in two capacities: Managing Director of U.S. Steel Logistics and

President of Transtar. On information and belief, Sommers resides at 333 Birch Street, Imperial, Pennsylvania 15126.

9.      At all relevant times, U.S. Steel, Transtar, and Union Railroad ("U.S. Steel Companies") continuously employed more than 15 employees and were covered employers as defined by the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101 *et seq.*), the Age Discrimination in Employment Act ("ADEA" – 29 U.S.C. §§ 621 *et seq.*), and the Pennsylvania Human Relations Act ("PHRA" – 43 P.S. §§ 951 *et seq.*).

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that Marsh's claims arise under the laws of the United States and Marsh seeks redress for violations of federal laws.

11.      The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367, because such claims are so closely related to Marsh's federal claims that they form part of the same case or controversy.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b)(2) as a substantial part of the events or omissions giving rise to Marsh's claims occurred in this district at a location which was owned, managed and operated by the U.S. Steel Companies.

## FACTUAL BACKGROUND

### A.      The U.S. Steel Companies

13.      U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe.

14.      Transtar is one of U.S Steel's wholly owned subsidiaries and is responsible for meeting the transportation needs of U.S. Steel's steel-making facilities, which includes

transporting raw materials; providing in-plant transportation and movement of semi-finished steel; and moving finished products to their destination. As a result, U.S. Steel is dependent upon Transtar to meet the continuing needs of its day-to-day operations.

15.     Transtar is comprised of the following railway companies: Union Railroad, the Lake Terminal Railroad Company, the Lorain Northern Company, Fairfield Southern Company, Inc., Delray Connecting Railroad Company, and Texas & Northern Railroad Company.

16.     Upon information and belief, U.S. Steel and Transtar directly manage and control the terms and conditions of Union Railroad employees through executives like Carnes and Sommers.

17.     Upon information and belief, U.S. Steel and Transtar jointly control the terms and conditions of employment of Union Railroad employees.

**B.      The U.S. Steel Companies' Discriminatory Scheme**

18.     In or about May 2012, the U.S. Steel Companies, led by Hudson, Carnes, and Sommers, initiated a pretextual scheme to terminate Union Railroad employees who they believed were too costly to continue employing due to, among other things, their age (i.e., employees ages 40 years and older, "Senior Employees").

19.     Upon information and belief, the U.S. Steel Companies instituted these and other cost-cutting measures as part of a company-wide effort to enhance the bottom line of the U.S. Steel Companies.

20.     Among other things, Defendants' scheme included forcing many Senior Employees to sign "last chance" agreements intended for employees with substance abuse problems, then manipulating Union Railroad's demerits policy to issue a disproportionate number of demerits to those Senior Employees so they could be fired for cause.

21.     Conversely, younger employees alleged to have committed the same or comparable offenses as Plaintiff and other Senior Employees routinely received no demerits, substantially less demerits or were given an opportunity to expunge demerits from their records over time.

22.     In many cases, Plaintiff and other Senior Employees were disproportionately punished and/or received a disproportionate number of demerits for technical offenses Union Railroad had historically exercised discretion to ignore.

23.     At their grievance hearings and/or arbitrations, Plaintiff and other Senior Employees lacked adequate representation and were overwhelmingly denied relief due to a concerted effort by the Defendants to fabricate or exaggerate the bases for their terminations.  In some cases, Union Railroad withheld potentially exculpatory evidence from Senior Employees without repercussion.  Instead of fairly representing its union members as required by the collective bargaining agreement and applicable federal law, Defendant Smart Transportation Division, was complicit in the scheme.

24.     As further described below, Plaintiff was the victim of a discriminatory pattern and practice designed to weed out specific categories of employees.

**C.     Union Railroad's Discriminatory Application of Its Demerit Policy**

25.     Union Railroad's demerits policy was created to provide a uniform structure to address employee rule and policy violations in a consistent and fair manner. According to Union Railroad, the policy serves as a tool to assure rule compliance while offering employees the opportunity to correct poor behavior as well as to facilitate additional training where necessary.

26.     The demerits policy is used to manage employee discipline for offenses such as tardiness, safety violations and misuse of carrier property.

27.     Under the policy, managers may use informal coaching in lieu of formal discipline (demerits) for minor violations and have significant discretion with respect to the number of demerits assessed if they elect to issue demerits.

28.     If a manager elects to issue demerits, the maximum number of demerits that can be assessed for a single violation is 60. Employees who reach 100 demerits are subject to termination.

29.     Union Railroad's demerits policy includes a provision for the removal of demerits from an employee's personnel records if the employee does not accrue additional demerits in the 12, 24 and 36 months following his or her last offense.

30.     Beginning in or about May 2012, the U.S. Steel Companies, led by Sommers, Carnes, and Hudson, began manipulating the demerits policy to ensure that Plaintiff and other Senior Employees could be fired for cause.

31.     One of the ways that the U.S. Steel Companies targeted the Senior Employees was through use of "last chance" agreements. Historically, these "last chance" agreements had only been used to informally manage disciplinary action for employees with substance abuse problems.

32.     The "last chance" agreements were not sanctioned by the Collective Bargaining Agreement or the demerits policy.  In addition, none of the Senior Employees had an opportunity to bargain the terms of the "last chance" agreements.

33.     The "last chance" agreements stated that these Senior Employees could continue working at Union Railroad but were subject to immediate dismissal and waived all rights of appeal if accused of another offense.  Contrary to the Collective Bargaining Agreement, the "last chance" agreements expressly provided that Defendant Smart TD, relinquished all rights to

investigate or otherwise represent Plaintiff and other Senior Employees for future misconduct accusations.

34.     Unlike the demerits policy, the "last chance" agreements contained no provision for the gradual removal of demerits for good behavior.  Instead, they placed Senior Employees who devoted years of service to Union Railroad in a tenuous three (3) year probationary period.

35.     The U.S. Steel Companies targeted Senior Employees in other ways, including retaliating against Senior Employees who took time off for medical-related reasons; retaliating against Senior Employees whenever they reported safety violations; and retaliating against Senior Employees whenever they reported violations of internal rules, regulations, policies, and procedures.

36.     The U.S. Steel Companies' discriminatory application of these internal rules, regulations, policies and procedures targeted the Senior Employees while protecting younger (under age 40) employees.

37.     Younger employees alleged to have committed the same or comparable violations routinely received no punishment, substantially less punishment or were given an opportunity to remove any evidence of rules violations from their records after a certain amount of time lapsed.

38.     In many cases, Senior Employees were disproportionately punished after they were accused of committing highly technical offenses such as "stealing" 4 minutes of overtime or stepping into the "red zone" when the train slacked.

39.     As a Senior Employee, Plaintiff was subjected to this pattern and practice of discrimination on the basis of his age.

40.     Upon information and belief, Plaintiff was replaced by a younger candidate.

**D.    SMART TD Was Complicit in the Scheme to Terminate Senior Employees**

41.    Plaintiff and other Senior Employees were conductors, brakemen, switchtenders ("yardmen"), and/or utilitymen exclusively represented by Defendant Smart TD, pursuant to a Collective Bargaining Agreement effective November 1, 1943.

42.    Under the Collective Bargaining Agreement, these Senior Employees were generally entitled to an investigation, including a fair and impartial hearing, before they could be suspended or dismissed from service.

43.    Upon information and belief, Defendant Smart TD, retained or otherwise provided to Senior Employees the services of a law firm ("the Law Firm").

44.    As part of this agreement Defendant Smart TD would bring attorney-representatives from the Law Firm to regularly scheduled union meetings and introduce them as the "union attorneys." As a result, the Senior Employees would seek counsel from those attorneys on a variety of work-related matters.

45.    When discussing work-related disputes, such as claims of age discrimination, Plaintiff, along with other Senior Employees, was advised on numerous occasions by representatives from the Law Firm that there was nothing they could do for him. When pressed further, Plaintiff, along with other Senior Employees, was told that he had no other recourse but to rely on the union for work-related disputes because "when you're in [the company's] ballpark, you have to work by their rules."

46.    Plaintiff and other Senior Employees initially turned to officers of Defendant Smart TD's local chapter. Those officers largely accepted the pretextual bases for Plaintiff and other Senior Employees' terminations rather than take steps to rebut the discriminatory application of the "last chance" agreements and demerits policy.

47.     Plaintiff and other Senior Employees then turned to officers of Defendant Smart TD's Division Headquarters for assistance. Those officers refused to provide any assistance and deferred to the decisions made by officers of Defendant Smart TD's local chapter.

48.     Upon information and belief, officers of Defendant Smart TD's Division Headquarters supported and encouraged the local chapter's continued refusal to address the U.S. Steel Companies' targeting of the Senior Employees through the discriminatory application of the demerit policy. Defendant Smart TD's refusal to take action, on any level, constituted an organization-wide ratification of the rampant discrimination impacting its members who were employed throughout the U.S. Steel Companies.

49.     In addition, Defendant Smart TD, either themselves or through the Law Firm, failed to inform Plaintiff and other Senior Employees that certain statute of limitations may apply to their disputes and filing grievances would not toll application of those statute of limitations to their claims of discrimination. In fact, Plaintiff and other Senior Employees were specifically told they were forbidden from seeking other outside counsel until they had arbitrated their claims and exhausted any applicable appeals.

50.     As such, Defendant Smart TD, either themselves or through the Law Firm, ensured that Defendants' discriminatory application of the "last chance" agreements and demerits policy would not be investigated by any outside and/or independent agency.

**E.      Improper Termination of Marsh's Employment**

51.     Plaintiff, Charles Marsh, was born on August 3, 1961.

52.     On June 4, 2007, Plaintiff, Charles Marsh, was hired by Union Railroad as a brakeman.

53.     Over the next eight years, Plaintiff was an exemplary employee. He was frequently provided with letters of commendation and on multiple occasions was asked by Union Railroad to train other employees, including managers, due to his experience, expertise and knowledge of the industry.

54.     In or about 2010, Union Railroad promoted Plaintiff to conductor.

55.     Over the next five years, Plaintiff met all the necessary performance metrics and maintained a zero-demerit record.

56.     Despite Plaintiff's exemplary work performance, he was subjected to harassing and retaliatory behavior at work whenever he sought accommodations for his arthritis and gastritis.

57.     That harassing and retaliatory behavior exacerbated Plaintiff's disabilities and impacted his ability to do his job.

58.     On February 11, 2019, Union Railroad alleged that Plaintiff committed a "cardinal rule" safety violation by stepping into the "red zone" when the train slacked. The alleged violation involved a breach of a few inches.

59.     The only evidence supporting Union Railroad's allegation was its claim that Plaintiff's supervisor, J. R. Horrell, witnessed the incident while on board the train.

60.     Plaintiff denied that he committed the violation and denied that J.R. Horrell could have seen the alleged violation from his vantage point. As a result, Plaintiff requested, among other things, copies of a regularly maintained engine camera that would have objectively shown whether the violation occurred.

61.     Before his grievance hearing, Plaintiff again requested, among other things, copies of the engine video. To date, Union Railroad has refused to produce the video and has provided no justification for its refusal.

62.     Defendant Smart TD took no meaningful steps to secure a copy of the engine camera.

63.     Despite being denied any real opportunity to contest the alleged offense, Plaintiff was assessed 60 demerits and terminated from Union Railroad effective March 8, 2019. At the time of his termination, Plaintiff was 57 years old.

64.     It is believed that the U.S. Steel Companies acted willfully and in reckless disregard of Marsh's rights under the ADEA and the PHRA when it targeted Marsh with the discriminatory demerit policy because they believed that due to his age, he was or would be unable to perform the essential functions of his job.

65.     Marsh, however, was able to perform the essential functions of his job as at all relevant times.

66.     It is also believed that U.S. Steel Companies acted willfully and in reckless disregard of Marsh's rights under the ADA when it interfered with his attempts to seek reasonable accommodations for his disabilities.

67.     As a result of the U.S. Steel Companies' discrimination, Marsh has suffered and will continue to suffer a substantial loss of earnings, including, but not limited to, loss of salary, bonuses, benefits, health insurance, life insurance, and other emoluments of employment.

68.     As a further direct and proximate cause of the U.S. Steel Companies' discrimination, Marsh's reputation and career have been damaged.  Marsh has also experienced

physical pain and suffering, and severe emotional distress, including anxiety, post-traumatic stress disorder, and depression.

**F.**     **Marsh's Exhaustion of his Administrative Remedies**

69.     On July 23, 2019, Marsh filed a Charge of Discrimination against the U.S. Steel Companies with the Equal Employment Opportunity Commission ("EEOC"), alleging age and disability discrimination.

70.     Marsh's Charge was dual-filed with the Pennsylvania Human Relations Commission ("PHRC").

71.     By letter dated April 30, 2020, the EEOC notified Marsh of his right to file a civil action against the U.S. Steel Companies.

72.     Marsh has initiated this civil action within 90 days of receiving the EEOC's Right to Sue letter.

73.     In accordance with 43 P.S. § 962(c)(2) of the Pennsylvania Human Relations Act, Marsh is contemporaneously serving a copy of this Complaint on the PHRC.

74.     Marsh has exhausted his administrative remedies under federal and Pennsylvania law.

## STATEMENT OF CLAIMS

### Count One
Violations of the Age Discrimination in Employment Act
(Marsh v. U.S. Steel, Transtar, and Union Railroad)

75.     Marsh incorporates by reference the allegations in Paragraphs 1 through 74, as if fully set forth herein.

76.     The U.S. Steel Companies discriminated against Marsh, on the basis of his age and in violation of the ADEA, by firing Marsh because he was 57 years old.

77.     The acts and omissions by the U.S. Steel Companies that are described in this Complaint constitute unlawful discrimination under the ADEA.

78.     As a proximate result of the U.S. Steel Companies' conduct, Marsh has or will suffer substantial harm, for which Marsh seeks general, compensatory, consequential, and punitive damages.

### Count Two
Violations of the Americans with Disabilities Act
(Marsh v. U.S. Steel, Transtar, and Union Railroad)

79.     Marsh incorporates by reference the allegations in Paragraphs 1 through 78, as if fully set forth herein.

80.     The U.S. Steel Companies harassed and retaliated against Marsh whenever he sought accommodations for his disabilities.

81.     The acts and omissions by the U.S. Steel Companies that are described in this Complaint constitute interference with Marsh's rights under the ADA.

82.     As a proximate result of the U.S. Steel Companies' conduct, Marsh has or will suffer substantial harm, for which Marsh seeks general, compensatory, consequential, and punitive damages.

13

<u>Count Three</u>
Violations of the Pennsylvania Human Relations Act
(Marsh v. U.S. Steel, Transtar, Union Railroad,
Joel Hudson, Jonathan Carnes, and Malisa Sommers)

83.     Marsh incorporates by reference the allegations in Paragraphs 1 through 82, as if fully set forth herein.

84.     The U.S. Steel Companies discriminated against Marsh, on the basis of his age and in violation of the PHRA, by firing Marsh because he was 57 years old.

85.     The acts and omissions by the U.S. Steel Companies described in this Complaint were only possible because of the roles that Hudson, Carnes, and Sommers played in creating and implementing policies to be used in discriminatory ways.

86.     Hudson, Carnes, and Sommers carried out the targeting of specific categories of employees to ensure that the cost-cutting measures that were being implemented throughout the U.S. Steel Companies were carried out successfully at Union Railroad.

87.     The acts and omissions by Hudson, Carnes, Sommers, and the U.S. Steel Companies also violated the PHRA's prohibition against the interference with an employee's right to seek reasonable accommodations for a disability.

88.     The discrimination has caused Marsh to suffer extreme mental anguish, emotional distress, and loss of income.

89.     As a proximate result of the conduct by Hudson, Carnes, Sommers, and the U.S. Steel Companies, Marsh has or will suffer substantial harm, for which Marsh seeks general, compensatory, consequential, and punitive damages.

Count Four
Breach of Duty of Fair Representation
(Marsh v. Smart TD)

90.     Marsh incorporates by reference the allegations in Paragraphs 1 through 89, as if fully set forth herein.

91.     Under the Collective Bargaining Agreement, Smart TD was the exclusive bargaining representative for Plaintiff.

92.     Smart TD breached its duty to fairly represent Plaintiff by acting or failing to act in such a way that was arbitrary, discriminatory and/or in bad faith.

93.     Smart TD's conduct contributed to the erroneous outcome of the contractual proceedings.

94.     Plaintiff was proximately harmed by Defendant Smart TD's breach of its duty of fair representation.

95.     As a proximate result of Smart TD's conduct, Marsh has or will suffer substantial harm, for which Marsh seeks general, compensatory, consequential, and liquidated damages.

Requests for Relief

Accordingly, Marsh requests that this Court enter judgment on his behalf and enter an order directing the award of other relief, as follows:

A.      Finding that the U.S. Steel Companies violated the ADEA;

B.      Finding that the U.S. Steel Companies violated the ADA;

C.      Finding that Hudson, Carnes, Sommers and the U.S. Steel Companies violated the PHRA;

D.      Finding that Smart TD breached its fiduciary duty to Marsh;

15

E.      Awarding Marsh back pay, front pay, lost benefits, and other emoluments of

employment and such other relief as is necessary to make him whole;

F.      Awarding Marsh compensatory damages for pain, humiliation, emotional distress,

and damage to reputation;

G.      Awarding Marsh liquidated damages under the ADEA;

H.      Awarding Marsh punitive damages under the ADA;

I.      Awarding Marsh attorneys' fees and costs;

J.      Awarding Marsh pre- and post-judgment interest as provided by law; and

K.      Awarding Marsh any other relief to which he is entitled and/or which this Court

deems necessary and proper.

A jury trial is demanded for all claims triable by jury.

Dated:

Respectfully submitted,

**ANAPOL WEISS**                                    **EDGAR SNYDER & ASSOCIATES**

 /s/ Sol H. Weiss                                    /s/ Sammy Y. Sugiura
Sol H. Weiss, Esquire (ID #15925)          Sammy Y. Sugiura, Esquire (ID #209942)
Paola Pearson, Esquire (ID # 318356)
One Logan Square                                   U.S. Steel Tower, 10th Floor
130 N. 18th St., Suite 1600                    600 Grant Street
Philadelphia, PA 19103                          Pittsburgh, PA 15219
215-735-1130 (P)                                  412-391-2101 (P)
215-875-7701 (F)                                  412-391-7032 (F)
sweiss@anapolweiss.com                        ssugiura@edgarsnyder.com
ppearson@anapolweiss.com

**COUNSEL FOR PLAINTIFF**