**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARLES MARSH, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | 2:20-cv-01145-RJC |
| vs. | ) ) ) | |
| UNION RAILROAD COMPANY, LLC., TRANSTAR, LLC, UNITED STATES STEEL CORPORATION, SMART TRANSPORTATION DIVISION, JOEL HUDSON, JONATHAN CARNES, and MALISA SOMMERS, | ) ) ) ) ) ) ) ) | |
| Defendants. | | |

**<u>MEMORANDUM OPINION</u>**

Robert J. Colville, United States District Judge

      Before the Court are two motions to dismiss:  First,  the  Motion to Dismiss (ECF No. 30) filed by the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD" or "the Union"), and second, the Motion to Dismiss filed by  Defendants Jonathan Carnes, Joel Hudson, Malisa Sommers (collectively, the "Individual Defendants"),  as well as the Union Railroad Company, LLC ("the Railroad"), Transtar, LLC ("Transtar"), and United States Steel Corporation ("U.S. Steel") (collectively, the "Non-Labor Defendants") (ECF No. 31). Defendants' Motions have been fully briefed and are ripe for disposition.

**I.      Factual Background and Procedural History**

      Plaintiff, Charles Marsh, brings this action alleging: 1) at Count I, violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq*. ("ADEA"), against

U.S. Steel, Transtar and the Railroad, 2) at Count II, violations of the Americans with Disabilities Act ("ADA") against U.S. Steel, Transtar, and Union Railroad,  3) at Count III, violations of the Pennsylvania Human Relations Act  ("PHRA") against U.S. Steel, Transtar, Union Railroad, Joel Hudson, Jonathan Carnes, and Malisa Sommers, 4) at Count IV, breach of duty of fair representation against Smart-TD.

The allegations in the Amended Complaint (ECF No. 26) ("Am. Compl.") are as follows. Plaintiff, Scott Marsh, is an adult individual and a resident of Trafford, Pennsylvania. (Am. Compl. ¶ 1).  Effective March 8, 2019, at the age of 57, Plaintiff was terminated from Railroad where he had worked as a brakeman for more than 8 years, and then as conductor for five years. (Am. Compl. ¶ 52, 54, 63).  The Railroad is a wholly owned subsidiary of Transtar, an entity engaged in the business of transporting raw materials and finished products for a variety of industries. (Am. Compl. ¶ 14, 15).  The Railroad and Transtar are wholly owned subsidiaries of and operate in concert with U.S. Steel.  (Am. Compl. ¶ 14).

Plaintiff alleges that in or about May 2012, Defendants, led by 1) the Railroad, 2) the Railroad General Superintendent, Joel Hudson, 3)  U.S. Steel, 4) U.S. Steel General Manager, Jonathan Carnes, 5) U.S. Steel Managing Director, Malisa Sommers and 6) Transtar, initiated a pretextual scheme to terminate Railroad employees over age 40.[1]  (Am. Compl. ¶ 18). Defendants' scheme included forcing many Senior Employees to sign "last chance" agreements, then manipulating the Railroad's demerits policy to issue a disproportionate number of demerits to Senior Employees so they could be fired for cause. (Am. Compl. ¶ 20).   Conversely, younger employees alleged to have committed the same or comparable offenses as Plaintiff and other Senior Employees routinely received no demerits, substantially less demerits, or were given an opportunity to expunge

---

[1] Plaintiff's Amended Complaint refers these as "senior employees."

demerits from their records over time. (Am. Compl. ¶ 21).  In many cases, Senior Employees received a disproportionate number of demerits for technical offenses the Railroad had historically exercised discretion to ignore. (Am. Compl. ¶ 22).  At their grievance hearings and/or arbitrations, Plaintiff and other Senior Employees lacked adequate representation and were overwhelmingly denied relief due to a concerted effort by the Defendants to fabricate or exaggerate the bases for their terminations. In some cases, the Railroad withheld potentially exculpatory evidence from Senior Employees without repercussion. Instead of fairly representing its union members as required by the collective bargaining agreement and applicable federal law, the Union was complicit in the scheme. (Am. Compl. ¶ 23).  Plaintiff alleges he was the victim of a discriminatory pattern and practice designed to weed out specific categories of employees. (Am. Compl. ¶ 24).

## Demerits Policy and Last Chance Agreement

The Railroad's demerits policy was created to provide a uniform structure to address employee rule and policy violations in a consistent and fair manner. According to the Railroad, the policy serves as a tool to assure rule compliance while offering employees the opportunity to correct poor behavior as well as to facilitate additional training where necessary. (Am. Compl. ¶ 25). The demerits policy is used to manage employee discipline for offenses such as tardiness, safety violations and misuse of carrier property. (Am. Compl. ¶ 26). Under the policy, managers may use informal coaching in lieu of formal discipline (demerits) for minor violations and have significant discretion with respect to the number of demerits assessed if they elect to issue demerits. (Am. Compl. ¶ 27).  If a manager elects to issue demerits, the maximum number of demerits that can be assessed for a single violation is 60. Employees who reach 100 demerits are subject to termination. (Am. Compl. ¶ 28).  The Railroad's demerits policy includes a provision for the removal of demerits from an employee's personnel records if the employee does not

accrue additional demerits in the 12, 24 and/or 36 months following his or her last offense. (Am. Compl. ¶ 29).

Beginning in or about May 2012,  the U.S. Steel Companies, led by Sommers, Carnes, and Hudson, began manipulating the demerits policy to ensure that Plaintiff and other Senior Employees could be fired for cause. (Am. Compl. ¶ 30).  As part of the scheme, the U.S. Steel Companies targeted the Senior Employees to sign "last chance" agreements [2]the company had historically used to informally manage disciplinary action for employees with substance abuse problems. (Am. Compl. ¶ 31).

The Non-Labor Defendants' discriminatory application of these internal rules, regulations, policies and procedures targeted the older employees while protecting younger (under age 40) employees. (Am. Compl. ¶ 36). It is further alleged that  younger employees alleged to have committed the same or comparable violations routinely received no punishment, substantially less punishment or  were given an opportunity to remove any evidence of rules violations from their records after a certain amount of time lapsed. (Am. Compl. ¶ 37).  In many cases, senior employees were disproportionately punished after they were accused of committing highly technical offenses such as "stealing" four minutes of overtime or causing a train to move a few inches into a "red zone" when the train slacked. (Am. Compl. ¶ 38).

As a senior employee, Plaintiff was subjected to this pattern and practice of discrimination on the basis of his age. (Am. Compl. ¶ 39). Upon information and belief, Plaintiff was replaced by a younger candidate. (Am. Compl. ¶ 40).

---

[2] Plaintiff's Amended Brief in Opposition now concedes Marsh himself  was actually never subject to a last chance agreement.  S*ee* ECF No. 38.

**The Union: Smart-TD**

Plaintiff and other employees (conductors, brakemen and/or switchtenders ("yardmen")) were exclusively represented by the Union pursuant to the CBA, effective November 1, 1943.   (Am. Compl. ¶ 41).   Under the CBA, these senior employees were entitled to an investigation, including a fair and impartial hearing, before they could be suspended or dismissed from service.  (Am. Compl. ¶ 42).  The Union retained or otherwise provided to senior employees the services of a law firm ("the Law Firm").  (Am. Compl. ¶ 43).  As part of this agreement the Union would bring attorney-representatives from the Law Firm to regularly scheduled union meetings and introduce them as the "union attorneys." As a result, senior employees would seek counsel from those attorneys on a variety of work-related matters. (Am. Compl. ¶ 44).  When discussing work-related disputes, such as claims of age discrimination, Plaintiff, along with other senior employees, was advised on numerous occasions by representatives from the Law Firm that there was nothing they could do for  him.  When pressed further, Plaintiff was told that he had no other recourse but to rely on the union for work-related disputes because  "when you're in [the company's] ballpark, you have to work by their rules." (Am. Compl. ¶ 45).  Plaintiff and other senior employees initially turned to officers of the Union's local chapter, who largely accepted the pretextual bases for Plaintiff and other senior employees' terminations rather than take steps to rebut the discriminatory application of the last chance agreements and demerits policy. (Am. Compl. ¶ 46).

Plaintiff and other Senior Employees then turned to officers of Defendant Smart TD's Division Headquarters for assistance. Those officers refused to provide any assistance and deferred to the decisions made by officers of the Union's local chapter. (Am. Compl. ¶ 47). Officers of Defendant Smart TD's Division Headquarters supported and encouraged the local chapter's continued refusal to address the Non-Labor Defendants' targeting of the Senior Employees through the discriminatory application of the demerit policy. Defendant Smart TD's refusal to take action, on

any level, constituted an organization-wide ratification of the rampant discrimination impacting its members who were employed throughout the Non-Labor Defendants' companies. (Am. Compl. ¶ 48).

In addition, the Union itself  or through the Law Firm, failed to inform Plaintiff and other senior employees that certain statute of limitations may apply to their disputes and filing grievances would not toll application of those statute of limitations to their claims of discrimination. In fact, Plaintiff and other senior employees were specifically told they were forbidden from seeking other outside counsel until they had arbitrated their claims and exhausted any applicable appeals. (Am. Compl. ¶ 49).  As such, the Union, either itself or through the Law Firm, ensured that Defendants' discriminatory application of the "last chance" agreements and demerits policy would not be investigated by any outside and/or independent agency. (Am. Compl. ¶ 50).

## Plaintiff's Termination

Plaintiff was born on August 3, 1961.  (Am. Compl. ¶ 51).  On June 4, 2007, Marsh, was hired by the Railroad as a brakeman. (Am. Compl. ¶ 52).  Over the next eight-years Plaintiff was an exemplary employee. He was frequently provided with letters of commendation and on multiple occasions was asked by the Railroad to train other employees, including managers, due to his experience, expertise and knowledge of the industry. (Am. Compl. ¶ 53).   In or about 2010, the Railroad promoted Plaintiff to conductor. (Am. Compl. ¶ 54).  Over the next five years, Plaintiff met all the necessary performance metrics and maintained a zero-demerit record. (Am. Compl. ¶ 55).

Despite Plaintiff's exemplary work performance, he was subjected to harassing and retaliatory behavior at work whenever he sought accommodations for his arthritis and gastritis. (Am. Compl. ¶ 56).  That harassing and retaliatory behavior exacerbated Plaintiff's disabilities and impacted his ability to do his job. (Am. Compl. ¶ 57).   On February 11, 2019, Union Railroad alleged that Plaintiff committed a "cardinal rule" safety violation by stepping into the "red zone" when the train slacked. According to plaintiff the alleged violation involved a breach of a few

6

inches. (Am. Compl. ¶ 58).  The only evidence supporting Union Railroad's allegation was its claim that Plaintiff's supervisor, J. R. Horrell, witnessed the incident while on board the train. (Am. Compl. ¶ 59).  Plaintiff denied that he committed the violation and denied that J.R. Horrell could have seen the alleged violation from his vantage point. As a result, Plaintiff requested, among other things, copies of a regularly maintained engine camera that would have objectively shown whether the violation occurred. (Am. Compl. ¶ 60).

Before his grievance hearing, Plaintiff again requested, among other things, copies of the engine video. To date, the Railroad has refused to produce the video and has provided no justification for its refusal. (Am. Compl. ¶ 61).  Defendant Smart TD took no meaningful steps to secure a copy of the engine camera. (Am. Compl. ¶ 62).  Despite being denied any real opportunity to contest the alleged offense, Plaintiff was assessed 60 demerits and terminated from the Railroad effective March 8, 2019. At the time of his termination, Plaintiff was 57 years old. (Am. Compl. ¶ 63).

Following the termination of his employment,  Plaintiff alleges Defendant Smart TD failed to raise any claims on behalf of Plaintiff which referenced or related to the discriminatory scheme described above and the violations of federal and state law. (Am. Compl. ¶ 64).  Since Defendant Smart TD failed to preserve discriminatory-related claims on Plaintiff's behalf, Plaintiff has been and will continue to be barred from raising those issues in arbitration through the National Railroad Adjustment Board ("NRAB"). (Am. Compl. ¶ 65).   It is believed that the Non-Labor Defendant companies acted willfully and in reckless disregard of Marsh's rights under the ADEA and the PHRA when they targeted Marsh with the discriminatory demerit policy because they believed that due to his age, he was or would be unable to perform the essential functions of his job. (Am. Compl. ¶ 66).  Marsh alleges he was able to perform the essential functions of his job as at all relevant times. (Am. Compl. ¶ 67).  It is also believed that Non-Labor Defendants willfully and in reckless disregard of Marsh's rights under the ADA when it interfered with his attempts to seek reasonable accommodations for his disabilities. (Am. Compl. ¶ 68).  As a result of this discrimination, Marsh

has suffered and will continue to suffer a substantial loss of earnings, including, but not limited to, loss of salary, bonuses, benefits, health insurance, life insurance, and other emoluments of employment. (Am. Compl. ¶ 69).  As a further direct and proximate cause of the Non-Labor Defendants' discrimination, Marsh alleges his reputation and career have been damaged. Marsh has also experienced physical pain and suffering, and severe emotional distress, including anxiety, post-traumatic stress disorder, and depression. (Am. Compl. ¶ 70).

On July 23, 2019, Marsh filed a Charge of Discrimination against the Non-Labor Defendants with the Equal Employment Opportunity Commission ("EEOC"), alleging age and disability discrimination. (Am. Compl. ¶ 71).  Marsh's Charge was dual-filed with the Pennsylvania Human Relations Commission ("PHRC"). (Am. Compl. ¶ 72).  By letter dated April 30, 2020, the EEOC notified Marsh of his right to file a civil action against the Non-Labor Defendants. (Am. Compl. ¶ 73).

## II.    Legal Standard

A court must grant a motion to dismiss under Rule 12(b)(1) if it determines that it lacks subject matter jurisdiction over a claim. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). "Generally, where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *The Connelly Firm, P.C. v. U.S. Dep't of the Treasury*, No. 15-2695, 2016 WL 1559299, at *2 (D. N.J. Apr. 18, 2016) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)).

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-

pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

"[A]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  *Id.* (internal quotation omitted).

### III.   Discussion

**A.  The Union's Motion to Dismiss (ECF No. 30)**

First, we will address the Motion to Dismiss filed by the Union.  The sole count naming the Union is Count IV, which alleges the Union breached the duty of fair representation.

The Union argues that Plaintiff has failed to allege any basis for invoking federal jurisdiction against it, noting Plaintiff's counsel is grieving his discharge before the National Railroad Adjustment Board ("NRAB"). Even if Plaintiff's action were ripe, the Union argues Plaintiff fails to state a claim against the International Union, which cannot be held liable for actions of a subordinate body in the absence of certain factors not alleged here. According to the Union, Plaintiff's bald and conclusory allegations are insufficient to state a legally cognizable claim for relief against the Union, and Plaintiff has failed to adequately allege that the Railway breached the CBA when it dismissed him from service, a necessary prerequisite for such a claim.

The Union attaches the CBA to its motion (ECF No. 30-3, Exhibit A (the "CBA")), which establishes the following.[3]  The Union (i.e. SMART-TD) is the duly authorized representative for the purposes of the Railway Labor Act ("RLA") of the crafts or classes of train service employees such as Plaintiff Marsh, and is a representative as defined by Section 1 Sixth of the Act, 45 U.S.C. § 151.  (CBA at Rule 46(A)).  The express terms of the CBA provide that in accordance with the certifications of the National Mediation Board, "the General Committee of the Brotherhood of Railroad Trainmen (SMART-TD(T)), [i.e. the General Committee of Adjustment ("GCA") GO-969][4] shall represent employees in collective bargaining with the Company with regard to rates of pay, rules and working conditions.   (CBA at Rule 46(c)). The

---

[3] We find that the CBA is a document central to Plaintiff's claim, and accordingly, will consider the CBA in deciding the motion to dismiss without converting the motion to a motion for summary judgment.
[4] This body, it is argued, is  separate and distinct from the named defendant herein, Smart-TD, which we have been referring to, for convenience sake, as "the Union").

GCA GO-969 has interpretive authority over the agreement; grievances and disciplinary matters are handled locally and then at the GCA level.  (CBA at Rules 34, 36). Plaintiff has named as defendant SMART-TD, an  international labor organization  located in North Olmsted, Ohio. (Am. Compl. ¶ 5).

The Railroad is a corporation engaged in the interstate transportation of goods by rail, and is a "carrier" as defined by Section 1 First of the RLA, 45 U.S.C. § 151 First. *Bhd. of Loco. Eng'rs & Trainmen v. Union R.R*, 660 F. Supp. 2d 582, 584 (W.D. Pa. 2009), dismissing appeal, 391 Fed. Appx. 182 (3d Cir. 2010). The Railroad has its principal operating office in Pittsburgh, Pennsylvania. (Am. Compl. ¶ 2).

SMART-TD GCA 969 and the Railroad are parties to various agreements covering train service employees. (Am. Compl. ¶ 41; Ex. A, CBA). According to the Amended Complaint, since prior to 2012, the Railroad has utilized a demerits policy which affords its management with discretion to issue coaching in lieu of formal discipline. (Am. Compl. ¶¶ 18, 22, 27). Under the Railroad's policy, employees who receive 100 demerits are subject to termination. (Id. at ¶ 28).

The CBA provides:

### Rule 36 – Grievances, How Handled

 Any grievances or controversies arising from application of the rules herein shall be taken up first by the Local Committee with designated officers, up to and including the Superintendent of Operations. In the event of failure on the part of the Local Committee to reach a satisfactory settlement with the designated officer representing Management, the matters in dispute will be referred to the General Committee of the Brotherhood of Railroad Trainmen (SMART-TD(T)), who will handle such disputes with the highest designated operating officer representing Management.

*Id.*  Grievances are not handled by the international union, named Defendant herein. The CBA was signed by a representative of the Railroad and the General Chairman of GO-969.  (ECF No.

24-1 at 3, Exhibit A, CBA at 3).  The discipline and appeals procedure is set forth in Rule 34 of

the CBA; if the dispute remains unresolved once it has been appealed to the highest designated

officer, it can be progressed to arbitration, in accordance with Section 3 of the RLA.  45 U.S.C. §

153.  Arbitration is available under the Act through either the NRAB under 45 U.S.C. § 153

First, or through a Public Law Board ("PLB") pursuant to 45 U.S.C. § 153 Second. Arbitration

decisions under the RLA are "final and binding." 45 U.S.C. § 153 First (m).

Following a disciplinary investigation held on February 25, 2019, the Railroad terminated

Plaintiff by letter dated March 8, 2019. (Am. Compl. ¶ 63; Ex. B at 3). SMART-TD grieved

Plaintiff's discharge in accordance with the steps prescribed by the CBA up to arbitration. (Ex. B

at 3-4). In lieu of being represented by the Union at his arbitration before the First Division of

the NRAB, Plaintiff chose to be represented by his personal attorney, who is also representing

him in this matter, as is his right under Section 3 First (i) and (j) of the RLA, 45 U.S.C. § 153

First (i), (j).7 Plaintiff, through his own counsel, filed a Notice of Intent with the First Division

on December 6, 2019. (Exs. B at 2-4, C at 2-4). The NRAB directed Plaintiff's counsel to file his

submissions within 75 days, or by February 19, 2020. (Exs. B at 1, C at 1). By letters dated June

2, 2020, the NRAB informed Plaintiff's counsel that it had not yet received his submissions and

was granting Plaintiff with an additional 15-days from the date of the letter in which to do so.

(Exs. D, E). Notwithstanding his pending claim before the NRAB, Plaintiff filed  this suit against

both his former employer and SMART-TD International.

### 1. Subject Matter Jurisdiction

The Amended Complaint does not specifically allege the basis of jurisdiction as deriving

from the NLRA, other than to say: "This Court has subject matter jurisdiction over this action

pursuant to 28 U.S.C. §1331 in that Marsh's claims arise under the laws of the United States and

Marsh seeks redress for violations of federal laws" and, further, supplemental jurisdiction over state law claims. (Am. Compl. ¶¶ 10, 11).   In his Brief in Opposition to the Motion to Dismiss, however, Plaintiff relies upon the duty of fair representation as codified in the NLRA.  (ECF No. 37 at 10-11).

The Union argues that this Court lacks jurisdiction to hear the duty of fair representation ("DFR") claim, insofar as it can be understood that Plaintiff brings this action under Section 8(b)(1)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq.*, as amended in the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, *et seq.*  In essence, the Union argues that Plaintiff's employment is governed by the CBA under the jurisdiction of the RLA, and because Plaintiff has failed to properly allege subject matter jurisdiction under the RLA, the Amended Complaint should be dismissed.

Section 152(3) of the NLRA, as amended by the LMRA, provides:

(3) The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, . . . ***but shall not include*** any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or ***any individual employed by an employer subject to the Railway Labor Act, as amended from time to time***, or by any other person who is not an employer as herein defined.

29 U.S.C. § 152(3).  In *Masy v. New Jersey Transit Rail Operations, Inc.*, 790 F.2d 322 (3d Cir. 1986), employees of railroad brought breach of contract and breach of duty of fair representation claims against the employer and the union charged with the duty of representing them. The United States District Court for the District of New Jersey dismissed their claim against the employer and granted union's motion for summary judgment, and employees appealed. The plaintiffs had argued that section 301 of the LMRA provides the jurisdictional grant for their suit against the employer.  On appeal, the United States Court of Appeals for the Third Circuit held

13

that "the district court, however, correctly held that the LMRA expressly excludes employees and employers governed by the Railway Labor Act from its coverage. *Masy,* 790 F.2d at 325, citing 29 U.S.C. § 152(2), (3); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co*., 394 U.S. 369, 376, 89 S.Ct. 1109, 1114, 22 L.Ed.2d 344 (1969). "Hence plaintiffs' federal claim against NJT must rely on the Railway Labor Act." *Id.*

Based on the clear statutory exclusion and precedential weight of *Masy,* the Union argues this Court lacks jurisdiction under the NLRA to hear this matter because plaintiff has brought his DFR claim under the NLRA, which expressly excludes his employment from coverage.  29 U.S.C. § 152(3). This argument is not without precedential support.

In *Hammill v. Communication Workers of America,* C.A. 08-1476, 2009 WL 291166, *3-4 (W.D. Pa. Feb. 5, 2009) plaintiff sued his employer for breach of the collective bargaining agreement, and his employer, U.S. Airways, filed a motion to dismiss, arguing, *inter alia*, that the Court lacked subject matter jurisdiction on the grounds that the cases brought by employees of the air carrier are governed by the RLA because the LMRA expressly excludes entities covered by the RLA from the scope of cases governed by the LMRA.  The court agreed:

> Plaintiff appears to believe, then, that although the RLA would govern his dispute with his employer, the LMRA applies to his claims against his union. This is clearly incorrect. "Congress enacted the RLA to promote stability between labor and management ... and to, among other things, 'provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'" . . . Numerous courts have applied the RLA in cases where the airline employee has sued his union for breach of its duty of fair representation.

*Hammill*, 2009 WL 291166, * 4 (citing cases).  The court then granted the motion to dismiss without prejudice on the grounds it did not have jurisdiction over Plaintiff's claims under the

LMRA, holding the applicable federal statute is the RLA.[5] On this basis, we lack jurisdiction over the Union.

The Union argues that the Plaintiff should not be afforded an opportunity to cure any deficiency by the granting of leave to amend, because the pleading deficiency has been brought to his counsel's attention on numerous occasions in meet and confer conferences held with respect to previously filed motions to dismiss.[6]  We disagree and will grant the motion to dismiss without prejudice.

Accordingly, the motion to dismiss Count IV is granted to the extent Plaintiff relies on the inapplicable federal statute.

### 2.  Sufficiency of the Allegations: Breach of Duty of Fair Representation

Having found we lack subject matter jurisdiction over the claim against the Union, we nevertheless note that Plaintiff has failed to state a claim for which relief can be granted as to the breach of the duty of fair representation ("DFR"). First, to the extent he intends to bring a "hybrid" claim  Plaintiff has failed to allege the Railroad breached the CBA in dismissing him, which courts have held is a necessary prerequisite to state a claim against the Union in a hybrid DFR claim.  *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir.1993).  Moreover, Plaintiff has failed to state a claim for breach of the duty of fair representation. The court in *Ciarla v. United*

---

[5] Despite the court's granting an opportunity to amend the complaint, Plaintiff did not seek leave of court to file an amended complaint the case was thereafter dismissed.

[6] In addition, we note that the Union cannot be held vicariously liable for the actions or inactions of its subordinate bodies, here local GCA GO-969 as opposed to named defendant, SMART-TD, i.e. the international labor union. The Amended Complaint fails to allege that the international union was aware of, or otherwise involved in, the alleged breach of the duty of fair representation, or had a duty under the CBA to file a grievance on his behalf.  Rather, as the CBA states, the authority as exclusive bargaining representative lies with GCA GO-969 – not the international Union. (ECF No. 30-3,CBA at Rule 34, 36, 46(c)).  *Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1288 (3d Cir. 1991).  Plaintiff has failed to state a claim as to the Defendant named in the Amended Complaint. Plaintiff has requested he be permitted to amend his complaint or enter into a stipulation substituting the party GCA GO-969 for SMART-TD.  (ECF No. 37 at 1.)   Although the Union's counsel expressly mentioned this error in their discussions prior to filing what was then their draft motion to dismiss the original complaint, prior to the Plaintiff's filing to the Amended Complaint, leave to amend will be granted.

*Government Security Officers of America,* C.A. No. 18-15787, 2019 WL 4566942, at *2 (D. N.J.

Sept. 20, 2019) explained the necessary elements to such a claim:

> Notably, even if the union fails to proceed with a grievance or decides not to
> arbitrate a meritorious claim, a breach of the "duty of fair representation occurs
> only when [the] union's conduct toward a member of the collective bargaining
> agreement is arbitrary, discriminatory or in bad faith." *Walczak v. Interstate
> Brands.* No. 99-284, 2000 WL 1580109, at *7 (D.N.J Sept. 18, 2000) (quoting
> *Cole v. Pathmark of Fairlawn*, 672 F. Supp. 796, 804 (D.N.J Oct. 30, 1987)).
> A union's actions will only be deemed arbitrary if, "in light of the factual and
> legal landscape at the time of the union's actions, the union's behavior is so far
> outside a wide range of reasonableness as to be irrational." *Bakos v. Am. Airlines,
> Inc.*, 748 Fed. Appx. 468, 471-472 (3d Cir. 2018) (quoting *Air Line Pilots Ass'n
> Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). Such a "'wide range of reasonableness'
> gives the union room to make discretionary decisions and choices, even if those
> judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S.
> 33, 45-46 (quoting *Air Line Pilots Ass'n Int'l*, 499 U.S. at 67). To show
> discrimination on part of the union, "a plaintiff must adduce substantial evidence
> of discrimination that is intentional, severe, and unrelated to legitimate union
> objectives." *Bakos*, 748 Fed. Appx. at 472 (quoting *Addington v. U.S. Airline
> Pilots Ass'n*, 791 F.3d 967, 984 (9th Cir. 2015) (internal quotation marks
> omitted)). To show bad faith on part of the union, a plaintiff must put forth "a
> showing of fraudulent, deceitful, or dishonest action." *Id.* (quoting *White v. White
> Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001)).

Here, Plaintiff has alleged few facts in support of the DFR claim.[7] His allegations are

largely labels and conclusions, or mere "formulaic recitation of the elements of a cause of

action." *Twombly*, 550 U.S. at 555. He alleges the Union breached its DFR by "acting or failing

to act in a manner that is arbitrary, discriminatory and/or in bad faith" and that it's "conduct

contributed to the erroneous outcome of the contractual proceedings." (Am. Comp. ¶¶ 95-96).

What is lacking from the allegations is any factually specific support to the claim defendant's

conduct was so far outside the wide range of reasonableness normally afforded to the Union, or

---

[7] Moreover, according to counsel, Plaintiff has not yet completed the arbitration process, and his case is currently
pending before the NRAB.  A recent check of the docket in the NRAB revealed that Plaintiff's case was not listed as
"active." To the extent Plaintiff challenges the Union's handling of his termination case, no cause of action may
have accrued and the case is not ripe; arguably this court lacks jurisdiction.  *See Bensel v. Allied Pilots Ass'n*, 387
F.3d 298, 307 (3d Cir. 2004).

facts to support adverse discriminatory motive.  Rather, the Amended Complaint does not provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id*. (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Thus, the Motion to Dismiss is granted in this regard, and the Amended Complaint is dismissed without prejudice.

### 3.  Statute of Limitations

An alternative basis of dismissal is timeliness.  Plaintiff has asserted a claim arising from an alleged failure to include his discrimination claims during the grievance procedure.  The Union argues the Amended Complaint should be dismissed on the grounds of untimeliness, noting accurately that the statute of limitations for a duty of fair representation claim against a union under the RLA is six months. 45 U.S.C. § 153;  *Miklavic v. USAir Inc*., 21 F.3d 551, 556 (3d Cir. 1994) ("Under the Railway Labor Act, the applicable limitations period for a DFR claim against a union is six months"); *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 304 (3d Cir. 2004); *Sisco v. Consolidated Rail Corp*., 732 F.2d 1188, 1193–94 (3d Cir.1984).  Plaintiff was terminated on March 8, 2019, he filed a notice of intent with the NRAB on December 6, 2019, and this action was filed on July 30, 2020.

Plaintiff argues that the DFR claim should be equitably tolled because of certain misrepresentations made to him by a law firm and the Union failed to inform him of the applicable limitations period.  We note that it is not entirely clear that equitable tolling is permitted under the RLA because Congress expressly intended to encourage prompt resolution of railway claims.  *See Colletti v. N.J. Transit Corp*., 50 Fed. Appx 513, 517 (3d Cir. July 31, 2002).  And Plaintiff has not alleged any requisite facts to support equitable tolling, i.e. that he

was "actively misled"; importantly, the Union is alleged to have been grieving his 2019 discharge until the point in time when he chose to be represented by his own counsel in arbitration.

As an alternative to dismissal, Plaintiff again proposes he be permitted to amend his complaint or take discovery before the determination is made as to the timeliness of his claim. He has been given an opportunity to correct any and all deficiencies as to claims against the Union, but out of an abundance of caution, the request to amend will be granted and Count IV will be dismissed without prejudice.

### B. Motion to Dismiss:  Non-Union Defendants [ECF No. 31]

The Non-Labor Defendants seek dismissal of the Amended Complaint on numerous grounds.

### 1. Preemption and Preclusion by the Railway Labor Act

First, the Non-Labor Defendants argue that the RLA preempts and precludes[8] all claims against them and thus, we lack subject matter jurisdiction. They argue that pursuant to the Railway Labor Act, mandatory arbitration before the Railway Labor Board is the exclusive forum for Marsh's claims and, accordingly, federal and state courts lack jurisdiction over such claims. 45 U.S.C. § 151, *et seq.*  We will deny the motion to dismiss in this regard.

In addition to the CBA (attached to motion as Exhibit 1, ECF No. 31-3), the Non-Union Defendants rely on the Railroad demerit policy (attached to motion as Exhibit 2, ECF No. 31-4).

---

[8] In *Norris*, the Supreme Court noted that state-law claims that require interpretation of a CBA would be "pre-empted," while claims based on federal law would be "precluded," and stated that the principles governing both concepts are the same. 512 U.S. at 259, n.6. Federal courts have used the terms "preclusion" and "preemption" interchangeably and likewise equated the two concepts. Preclusion and preemption are based on the same idea -- that federal labor law should control the issues in a case that requires interpreting a CBA -- but the former affects federal statutes while the latter affects state statutes. *See Sturge v. Northwest Airlines, Inc.*, 658 F.3d 832, 2011 WL 4634223, *8 (8th Cir. Oct. 7, 2011); *Brown v. Ill. Cent. R.R.,* 254 F.3d 654, 664 (7th Cir. 2001), *cert. denied*, 534 U.S. 1041 (2001)

The demerit policy provides, inter alia, that for insubordination (first offense) a worker is subject to dismissal (ECF No. 31-4).  Under the CBA, Marsh was provided an opportunity to have a formal investigation and to proceed to a grievance under the CBA.  The Union Railroad Demerit Policy states it is "intended to provide a uniform structure to address rule and policy violations in a consistent and fair manner."  (ECF No. 31-4 at 2).  It provides:

> The Policy shall not serve to amend, replace or modify the terms of any existing Collective Bargaining Agreement and employees shall retain all rights currently afforded them under such agreements.

In *Int'l Ass'n of Machinists & Aerospace Workers Dist. Loc. Lodge 1776 v. Jackson*, No. CIV.A. 09-150, 2010 WL 597247, at *3 (E.D. Pa. Feb. 19, 2010) the court explained when the RLA preempts and precludes claims, noting that the one relevant scenario arises where there is a "minor dispute":

> "A minor dispute is a dispute over the interpretation or application of existing collective bargaining agreements." *United Transp. Union v. Conemaugh & Black Lick R.R. Co.*, 894 F.2d 623, 628 (3d Cir.1990). A claim is a minor dispute if it, "implicate[s] practices, procedures, implied authority, or codes of conduct that are part of the working relationship." *Fry v. Airline Pilots Ass'n., Intern.*, 88 F.3d 831, 836 (10th Cir.1996).
>
> Importantly, and for purposes of the motion before this Court, minor disputes must be kept out of the courts and under the exclusive jurisdiction of an arbitration board. *See Independent Ass'n. of Continental Pilots*, 155 F.3d at 691 (citing *Union Pacific R.R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978)). When a claim is "inextricably intertwined" or "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," the claim is preempted. *Wall v. Americold Corp.*, 1997 WL 431006, at *2 (E.D. Pa. July 15, 1997) (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 & 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)).

2010 WL 597247 *3; *see also Int'l Ass'n of Machinists and Aerospace Workers Dist. Local Lodge 1776 v. Jackson,* No. 09-150, 2010 WL 597247 at *3 (E.D. Pa. Feb. 19, 2010).  Claims must be dismissed if they require "an examination into, and interpretation of, the terms of the [CBA] between [a plaintiff's] Union and the [employer]." *Malobabich v. Norfolk S. Corp.*, No.

2:11-CV-112, 2011 WL 1791306, at *2 (W.D. Pa. May 10, 2011) (quoting *Blackwell v. Am.*

*Airlines, Inc.*, No. 98 C 6856, 2003 WL 22159412, at *2 (N.D. Ill. Sept. 17, 2003)).

Plaintiff here claims that the Defendants' actions had discriminatory or retaliatory

motives; Non-Labor Defendants argue his claims were inextricably intertwined with, and

substantially dependent upon analysis of the CBA, and therefore, this court lacks subject matter

jurisdiction.  The central case relied upon by the Non-Labor Defendants is *Malobabich*. In that

case, Plaintiff's complaint alleged violations of the ADEA, a parallel age discrimination claim

under the Pennsylvania Human Relations Act, and the tort of intentional infliction of emotional

distress. Defendant employer filed a motion to dismiss, which the court granted on the grounds

of lack of subject matter jurisdiction:

> As an initial matter, the Court must ensure that it may exercise subject-matter
> jurisdiction. In this case, the jurisdictional analysis requires harmonization of two
> federal statutes. The ADEA, 29 U.S.C. § 626(c)(1), provides that individuals who
> allege age discrimination may bring an action in federal court to obtain legal or
> equitable relief. On the other hand, the Railway Labor Act ("RLA"), 45 U.S.C. §
> 151a et seq., establishes arbitration boards which have exclusive jurisdiction to
> resolve disputes over the interpretation or application of CBAs in the railroad
> industry.
>
> In determining whether subject-matter jurisdiction exists, the Court is not limited
> to the allegations of the Complaint. Rather, the Court may also consider
> extraneous evidence submitted by the parties. *Blackwell v. American Airlines,
> Inc.*, 2003 WL 22159412 *2 (N.D. Ill.2003) (citations omitted). Accordingly, the
> Court takes judicial notice of the existence of the CBA between NS and the
> Union, and the seniority rules contained therein. Notably, Malobabich has not
> challenged the authenticity of the CBA, and indeed, counsel for Plaintiff has
> explained that he "is not alleging that Defendant violated the CBA."

*Id.*, 2011 WL 1791306, at *1.  The court, adopting a broader preemption/preclusion rule, found

it lacked jurisdiction, noting:

> The age discrimination claims are not wholly independent from the CBA.
> Malobabich was hired as a 56–year–old student electrician and he does not
> dispute that the younger electricians had more seniority. His claim is adverse to

the CBA seniority rights of his coworkers. *Malobabich is not challenging the motives of NS, but instead, he facially challenges the CBA seniority rules as violative of the ADEA*. In other words, he contends that NS committed age discrimination because it abided by the CBA seniority rules. Clearly, this dispute is inextricably intertwined with and requires interpretation of the CBA.
 In addition, Congress has recognized that Malobabich's ADEA claim must be analyzed in conjunction with the CBA. Pursuant to the ADEA, 29 U.S.C. § 623(f)(2)(A): "It shall not be unlawful for an employer ... to observe the terms of a bona fide seniority system that is not intended to evade the purposes of this chapter." This provision not only casts doubt on whether Malobabich can ultimately succeed on the merits of his claims, it also reflects the intent of Congress that his age discrimination claim be evaluated in the context of the seniority rules set forth in the CBA which is governed by the RLA. In *Brown*, 254 F.3d at 668, the United States Court of Appeals for the Seventh Circuit held that ADA claims were precluded because interpretation of the CBA seniority provisions could conclusively dispose of the claim. In sum, the Court concludes that it lacks subject-matter jurisdiction over this case.

*Id*., 2011 WL 1791306, at *3 (citing *Brown v. Illinois Central R.R*., 254 F.3d 654 (7th Cir. 2001)

(emphasis added).

Yet the allegations in *Malobabich* differ from those in the Amended Complaint. Here,

Marsh takes issue with the demerits that were assessed and maintained against him under the CBA

and the Railroad's disciplinary rules and policies, as well as his  termination, but his central claim

is this was part of a pretextual scheme to terminate Railroad employees over age 40 on the basis of

their age in violation of the ADEA.  The motives of the Railroad are challenged.  Given the nature

of his claims herein, we will deny the motion to dismiss on the grounds of preemption.

Other courts have so held.  Recently, in *Andre Fields, et al. v. American Airlines, Inc., et*

*al*., No. CV 19-903-KSM, 2021 WL 4306021, at *21 (E.D. Pa. Sept. 22, 2021), the court rejected

the argument that the Plaintiffs' disparate treatment and retaliation claims  (racial discrimination)

were minor disputes under the RLA:

"[T]he [United States Supreme] Court has consistently held that the RLA minor dispute resolution machinery does not displace separate federal statutory rights granted to individual workers." *Blakely v. U.S. Airways, Inc*., 23 F. Supp. 2d 560,

> 568 (E.D. Pa. 1998) (discussing Supreme Court cases and holding that the RLA did not strip the court of jurisdiction to consider union members' ADA claims); *id*. at 574 ("The overwhelming majority of the courts of appeal have determined that employees covered by CBAs containing mandatory arbitration clauses retain the right to pursue statutory employment discrimination claims in federal court regardless of whether the employee has exhausted his or her contractual remedy.")

Although Plaintiff has alleged a discriminatory scheme amongst defendants, which the court finds are conclusory and lacking in sufficient particularity, the overall harm complained of pertains to his wrongful termination and involves rights or obligations that exist independently of the CBA.

Accordingly, the motion to dismiss the ADEA claim on the grounds of preclusion by the RLA pursuant to Federal Rule of Civil Procedure 12 (b)(1) will be denied.

### 2. Transtar and U.S. Steel: "Employers" under the ADEA

At Count I Plaintiff alleges violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, et seq. ("ADEA"), against U.S. Steel, Transtar and the Railroad. Under the ADEA, only employers may be held liable. 29 U.S.C. § 623*; Lewis v. Vollmer of America*, No. 05-1632, 2008 WL 355607, *1 (W.D. Pa. Feb. 7, 2008). Non-Labor Defendants argue that Defendants Transtar and U.S. Steel must be dismissed because they did not employ him. The Amended Complaint does not allege Marsh was employed by either of these two defendants, but rather, pleads Marsh was employed by the Railroad. (Am. Compl. ¶¶ 52, 54).

In response to this argument, Plaintiff argues we should apply a "joint employer" analysis, s*ee* ECF No. 34 at 14, 15, despite the fact that the Amended Complaint does not mention such a theory. Without specific facts in support, Marsh lumps the defendants together when he alleges "[i]n or about May 2012, the U.S. Steel Companies, led by Hudson, Carnes, and Sommers, initiated a pretextual scheme to terminate Union Railroad employees who they believed were too costly to continue employing due to, among other things, their age (i.e.,

employees ages 40 years and older, "Senior Employees").  (Am. Compl. ¶ 18).  He further

alleges that "[i]t is believed that the U.S. Steel Companies acted willfully and in reckless

disregard of Marsh's rights under the ADEA and the PHRA when it targeted Marsh with the

discriminatory demerit policy because they believed that due to his age, he was or would be

unable to perform the essential functions of his job."  (Am. Compl. ¶ 66).

In *Lewis v. Vollmer of Am.,* No. CIV. A. 05-1632, 2008 WL 355607, at *2-3 (W.D. Pa.

Feb. 7, 2008), the Court granted a motion to dismiss filed by defendant Wollmer Werke, an

alleged employer of a plaintiff alleging national origin and age discrimination.  Defendant moved

to dismiss on the grounds it was not plaintiff's employee, but rather, plaintiff was employed by

its subsidiary.  The Court held:

> It is undisputed that under Title VII, the ADEA and the PHRA only employers
> may be held liable for acts of discrimination. 42 U.S.C. § 2000e-2; 29 U.S.C. §
> 623; 43 P.S. § 959. Werke argues that because it was not plaintiff's employer at
> any time relevant to the complaint, it cannot be held liable for any of plaintiff's
> claims. . . . the fact that Werke and [the subsidiary] communicate with each other
> about products and customer needs does not appear particularly significant. . . .
> Thus, while these exhibits may demonstrate that the two companies interact with
> each other, they do not show, as plaintiff has suggested, that the two companies
> are so intertwined in their activities, labor relations and management that they are,
> in essence, a single employer.

We note that in *Lewis*, the court had a record as to the theory of that defendants therein

had acted as a joint or single employer.  As alleged, Marsh has failed to state a claim as to

Transtar and U.S. Steel, and accordingly, the motion to dismiss will be granted as to Count I with

respect to Transtar and U.S. Steel.

In his brief in opposition, Plaintiff seeks leave to amend the Amended Complaint as to

this claim.  We will grant this request.

### 3. Failure to Prosecute

To the extent Defendants argue that Marsh's ADEA claim is a repeat of a claim abandoned by Marsh in a parallel lawsuit, *Stouffer v. Union Railroad Company, et al*., C.A. 2:20-cv-00133-RJC, we note that in *Stouffer* Marsh was replaced as a class representative by Scott Stouffer after the complaint was amended. Plaintiff herein explains he has not and will not opt in the collective action in that parallel case. ECF No. 34 at 15. The motion to dismiss will be denied as moot in that regard.

### 4. Failure to Plead Claims with Specificity: Fed. R. Civ. P. 12 (b)(6)

Defendants argue that Plaintiff has not adequately plead any of his claims against them, specifically as to each claim the allegations of violations of the ADEA, the ADA, and the PHRA.

#### a. ADEA

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Keller v. Orix Credit All., Inc*., 130 F.3d 1101, 1108 (3d Cir.1997) (reaffirming the application of a "slightly modified version of [McDonnell Douglas ] in ADEA cases").

Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Keller*, 130 F.3d at 1108 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Satisfying the prima facie elements creates an "inference of unlawful discrimination." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir.1999) (quoting *Waldron v. SL Indus., Inc*., 56 F.3d 491, 494 (3d Cir.1995)). The elements of a prima facie case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir.2013).

The allegations in the Amended Complaint are insufficient to state a claim.  Plaintiff asserts that the actions taken pursuant to the demerits and disciplinary system were part of a scheme which was a cost cutting measure (Am. Compl. ¶¶ 18, 19).  However, he does not state any facts to support this allegation, such as the basis for the assertion that the scheme began in 2012, or who was involved.  He concludes that he was targeted due to his age, but alleges no specific facts in support of that claim.   And he asserts in conclusory fashion that he was replaced by a younger candidate, without naming the replacement.  (Am. Compl. ¶ 40).  Overall, the ADEA claim is speculative and lacks the requisite particularity such that it is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), *Twombly* and *Iqbal.*

Accordingly, the motion to dismiss will be granted with respect to the ADEA claim.

### b. ADA

A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise

qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Techs., Inc.,* 134 F.3d 576, 580 (3d Cir. 1998), citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996). To establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997).

Defendants argue that Plaintiff has failed to state a claim because he has not alleged that he is disabled within the meaning of the ADA.  The ADA defines a qualifying disability as 'a physical or mental impairment that substantially limits one or more of [the employee's] major life activities.'" *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp.3d 585, 592 (E.D. Pa. 2017) (quoting 42 U.S.C. § 12102(1)(a); citing *Amiot v. Kemper Ins. Co.,* 122 F. Appx. 577, 580 (3d Cir. 2004)).  This standard requires Plaintiff to include "a 'short and plain statement of the impact the impairment has on at least one major life activity.'" *Feliciano*, 281 F. Supp. 3d at 592.

Plaintiff alleges that he suffers from arthritis and gastritis, without any specific explanation or description of how said conditions may limit his ability to work. Nor does he plead any facts to support a possible causal connection for retaliation, i.e. a nexus between his alleged disability and his termination, or a failure to accommodate.

Accordingly, the motion to dismiss will be granted as to the ADA claim.

### c. PHRA

Plaintiff's PHRA claim refers to the acts and omissions by the Individual Defendants and the Non-Labor Defendants, alleging they fired him because he was 57 years old. (Am. Compl. ¶ 87). He alleges that "the acts and omissions by the [Non-Labor Defendants] . . . were only possible because of the roles that Hudson, Carnes, and Sommers played in creating and implementing policies to be used in discriminatory ways." He further alleges the Individual Defendants carried out the targeting of specific categories of employees to ensure that the cost-cutting measures that were being implemented throughout the U.S. Steel Companies were carried out successfully at the Railroad. (Am. Compl. ¶ 89).

These allegations fail to meet the pleading standard enounced in *Twombly* and *Iqbal*. They amount to mere conclusory allegations, wholly lacking in any factual specificity as to provide notice as to what acts and omissions he is alleging.

For this reason the motion to dismiss will be granted with respect to the PHRA claim.

### d. Leave to Amend

As set forth *supra*, the Amended Complaint lacks specificity in numerous respects, and Plaintiff has responded to these inadequacies with a request to be granted leave to amend. Defendants have explained that Plaintiff has previously been given an opportunity to address errors and omissions in the Amended Complaint.

Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is served." A motion to dismiss for failure to state a claim must be made "before pleading if a further pleading is permitted." Fed. R. Civ. P. 12(b). Thus, in the typical case in which a defendant asserts the defense of failure to state a claim by motion, the plaintiff may amend the complaint once "as a

matter of course" without leave of court. See 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[5], at 12–76 (3d ed.1999) (quoting Fed. R. Civ. P. 15(a)).

After amending once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court has instructed that although "the grant or denial of an opportunity to amend is within the discretion of the District Court, ... outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1434 (3d Cir.1997); *Lorenz v. CSX Corp*., 1 F.3d 1406, 1413–14 (3d Cir. 1993). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. *Burlington*, 114 F.3d at 1434. In assessing "futility," the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id*.; 3 Moore's Federal Practice, supra § 15.15[3], at 15–47 to –48 (3d ed. 2000).

If a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.   Accordingly, out of an abundance of caution, and in the interest of justice, we will permit Plaintiff to file a Second Amended Complaint as to his ADEA, the ADA, and  PHRA claims.

**IV. Conclusion**

       For the reasons discussed above, the Court will grant the motion to dismiss by the Union and will grant in part and deny in part the motion to dismiss by the Non-Labor Defendants, all without prejudice.  An appropriate Order of Court follows.

 

                                    BY THE COURT:

                                    s/*Robert J. Colville*
                                    Robert J. Colville
                                    United States District Judge

DATED: September 29, 2021

cc/ecf: All counsel of record