**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARLES MARSH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-cv-01145-RJC |
| | ) | |
| vs. | ) | |
| | ) | |
| UNION RAILROAD COMPANY, LLC., | ) | |
| TRANSTAR, LLC, UNITED STATES | ) | |
| STEEL CORPORATION, JOEL HUDSON, | ) | |
| JONATHAN CARNES, and MALISA | ) | |
| SOMMERS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge.

Before the Court is a motion to dismiss filed by Defendants Jonathan Carnes, Joel Hudson, Malisa Sommers (collectively, the "Individual Defendants"), as well as the Union Railroad Company, LLC ("the Railroad"), Transtar, LLC ("Transtar"), and United States Steel Corporation ("U.S. Steel") (collectively, the "U.S. Steel Companies") (ECF No. 60). Defendants' Motions have been fully briefed and are ripe for disposition.

I.      **Factual Background and Procedural History**

Plaintiff, Charles Marsh, brings this action alleging: 1) at Count I, violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq*. ("ADEA"), against the U.S. Steel Companies, 2) at Count II, violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") against the U.S. Steel Companies,  and  3) at Count III,

1

violations of the Pennsylvania Human Relations Act ("PHRA") against all defendants, i.e. the U.S. Steel Companies and the Individual Defendants.

On September 29, 2021, the Court issued a Memorandum Opinion (ECF No. 53) and Order (ECF No. 54) in this case, granting Defendants' Motions[1] to Dismiss Plaintiff's First Amended Complaint and granted leave to Plaintiff to file a Second Amended Complaint in an attempt to cure the deficiencies noted in that opinion.

The allegations in the Second Amended Complaint (ECF No. 55) ("SAC") are as follows. Plaintiff, Scott Marsh, is an adult individual and a resident of Trafford, Pennsylvania. (SAC ¶ 1). Effective March 8, 2019, at the age of 57, Plaintiff was terminated from Railroad where he had worked as a brakeman for more than 8 years, and then as conductor for five years.  (SAC ¶ 47, 48, 57, 58).  The Railroad is a wholly owned subsidiary of Transtar, an entity engaged in the business of transporting raw materials and finished products for a variety of industries. (SAC ¶ 14, 15).  The Railroad and Transtar are wholly owned subsidiaries of and operate in concert with U.S. Steel.  (SAC ¶ 14). U.S. Steel and Transtar directly manage and control the terms and conditions of Union Railroad employees through executives like Carnes and Sommers, each of whom held job titles which reflected the integrated nature of Union Railroad's operations with both Transtar and U.S. Steel.  (SAC ¶ 16).  U.S. Steel and Transtar jointly control the terms and conditions of employment of Union Railroad employees as Union Railroad is an entity that was created to benefit and support Transtar's and U.S. Steel's operations. (SAC ¶ 17).

Plaintiff alleges that in or about May 2012, Defendants, led by the Railroad General Superintendent, Joel Hudson, U.S. Steel General Manager, Jonathan Carnes, U.S. Steel Managing Director, Malisa Sommers, initiated a pretextual scheme to terminate Railroad

---

[1] Union defendant Smart Transportation Division ("Smart-TD"), represented by separate counsel, was dismissed from this case pursuant to a stipulation of dismissal on November 5, 2021.

employees who they believed were too costly to continue employing due to, among other things, their age, i.e. over the age of 40.[2]  (SAC ¶ 18).  Defendants' scheme included forcing many Senior Employees to sign "last chance" agreements, then manipulating the Railroad's demerits policy to issue a disproportionate number of demerits to Senior Employees so they could be fired for cause. (SAC ¶ 20).  Conversely, younger employees alleged to have committed the same or comparable offenses as Plaintiff and other Senior Employees routinely received no demerits, substantially less demerits, or were given an opportunity to expunge demerits from their records over time. (SAC ¶ 21).  In many cases, Marsh and Senior Employees were disproportionately punished and/or received a disproportionate number of demerits for technical offenses the Railroad had historically exercised discretion to ignore. (SAC ¶ 22).  At their grievance hearings and/or arbitrations, Plaintiff and other Senior Employees lacked adequate representation and were overwhelmingly denied relief due to a concerted effort by the Defendants to fabricate or exaggerate the bases for their terminations. (SAC ¶ 23).  Plaintiff alleges he was the victim of a discriminatory pattern and practice designed to weed out specific categories of employees. (SAC ¶ 24).

### Demerits Policy and Last Chance Agreement

The Railroad's demerits policy was created to provide a uniform structure to address employee rule and policy violations in a consistent and fair manner. According to the Railroad, the policy serves as a tool to assure rule compliance while offering employees the opportunity to correct poor behavior as well as to facilitate additional training where necessary. (SAC ¶ 25). The demerits policy is used to manage employee discipline for offenses such as tardiness, safety violations and misuse of carrier property. (SAC ¶ 26). Under the policy, managers may use informal coaching in lieu of formal discipline (demerits) for minor violations and have significant discretion with respect to the number of demerits assessed if they elect to issue

---

[2] Plaintiff's SAC refers these as "senior employees."

demerits. (SAC ¶ 27).  If a manager elects to issue demerits, the maximum number of demerits that can be assessed for a single violation is 60. Employees who reach 100 demerits are subject to termination. (SAC ¶ 28).  The Railroad's demerits policy includes a provision for the removal of demerits from an employee's personnel records if the employee does not accrue additional demerits in the 12, 24 and/or 36 months following his or her last offense. (SAC ¶ 29).

Beginning in or about May 2012, the U.S. Steel Companies, led by Sommers, Carnes, and Hudson, began manipulating the demerits policy to ensure that Plaintiff and other Senior Employees could be fired for cause. (SAC ¶ 30).  One of the ways that the U.S. Steel Companies targeted the Senior Employees was through the use of "last chance" agreements the company had historically used to informally manage disciplinary action for employees with substance abuse problems. (SAC ¶ 31).

Unlike the demerits policy, the "last chance" agreements contained no provision for the gradual removal of demerits for good behavior. Instead, they placed Senior Employees who devoted years of service to Union Railroad in a tenuous three (3) year probationary period. (SAC ¶ 34).  The U.S. Steel Companies targeted Senior Employees in other ways, including retaliating against Senior Employees who took time off for medical-related reasons; retaliating against Senior Employees whenever they reported safety violations; and retaliating against Senior Employees whenever they reported violations of internal rules, regulations, policies, and procedures.  (SAC ¶ 35).

The U.S. Steel Companies' discriminatory application of these internal rules, regulations, policies and procedures targeted the older employees while protecting younger (under age 40) employees. (SAC ¶ 36). It is further alleged that younger employees alleged to have committed the same or comparable violations routinely received no punishment, substantially less

4

punishment or were given an opportunity to remove any evidence of rules violations from their records after a certain amount of time lapsed. (SAC ¶ 37).  In many cases, senior employees were disproportionately punished after they were accused of committing highly technical offenses such as "stealing" four minutes of overtime or causing a train to move a few inches into a "red zone" when the train slacked. (SAC ¶ 38).

As a senior employee, Plaintiff was subjected to this pattern and practice of discrimination on the basis of his age. (SAC ¶ 39). For example, during the 2016 – 2017 timeframe, Marsh did not pass a switch banner proficiency test, and was issued thirty (30) demerits as a result. (SAC ¶ 40).  Around the same time, several of Marsh's coworkers under the age of forty (40) also failed the proficiency test but did not receive any demerits or were otherwise punished. (SAC ¶ 41).  During the 2017 – 2018 timeframe, Marsh was issued 15 demerits for a "delay of train" violation. (SAC ¶ 42). Around the same time, several of Marsh's coworkers under the age of forty (40) similarly caused a delay of train yet were not issued any demerits.  (SAC ¶ 43).  Upon information and belief, Plaintiff was replaced by a younger candidate after his termination. (SAC ¶ 44).

## Plaintiff's Termination

Plaintiff was born on August 3, 1961.  (SAC ¶ 45).  On June 4, 2007, Marsh, was hired by the Railroad as a brakeman. (SAC ¶ 46).  Over the next eight-years  Plaintiff was an exemplary employee. He was frequently provided with letters of commendation and on multiple occasions was asked by the Railroad to train other employees, including managers, due to his experience, expertise and knowledge of the industry. (SAC ¶ 47).   In or about 2010, the Railroad promoted Plaintiff to conductor. (SAC ¶ 48).  Over the next five years, Plaintiff met all the necessary performance metrics and maintained a zero-demerit record. (SAC ¶ 49).

Despite Plaintiff's exemplary work performance, he was subjected to harassing

and retaliatory behavior at work whenever he sought accommodations for his arthritis and gastritis. (SAC ¶ 50).  That harassing and retaliatory behavior exacerbated Plaintiff's disabilities and impacted his ability to do his job. (SAC ¶ 51).   On February 11, 2019, Union Railroad alleged that Plaintiff committed a "cardinal rule" safety violation by stepping into the "red zone" when the train slacked. According to plaintiff the alleged violation involved a breach of a few inches. (SAC ¶ 52). The only evidence supporting Union Railroad's allegation was its claim that Plaintiff's supervisor, J. R. Horrell, witnessed the incident while on board the train. (SAC ¶ 53).  Plaintiff denied that he committed the violation and denied that J.R. Horrell could have seen the alleged violation from his vantage point. As a result, Plaintiff requested, among other things, copies of a regularly maintained engine camera that would have objectively shown whether the violation occurred. (SAC ¶ 54).

Before his grievance hearing, Plaintiff again requested, among other things, copies of the engine video. To date, the Railroad has refused to produce the video and has provided no justification for its refusal. (SAC ¶ 55).  Smart TD took no meaningful steps to secure a copy of the engine camera. (SAC ¶ 62).  Despite being denied any real opportunity to contest the alleged offense, Plaintiff was assessed 60 demerits and terminated from the Railroad effective March 8, 2019. At the time of his termination, Plaintiff was 57 years old. (SAC ¶¶ 57, 58).

Following the termination of his employment, Plaintiff alleges Smart TD failed to raise any claims on behalf of Plaintiff which referenced or related to the discriminatory scheme described above and the violations of federal and state law. (SAC ¶ 59).  It is believed that the Non-Labor Defendant companies acted willfully and in reckless disregard of Marsh's rights under the ADEA and the PHRA when they targeted Marsh with the discriminatory demerit policy because they believed that due to his age, he was or would be unable to perform the essential functions of his job. (SAC ¶ 60).  Marsh alleges he was able to perform the essential functions of his job as at all relevant times. (SAC ¶ 61).  It is also believed that U.S. Steel Companies willfully and in reckless disregard of Marsh's rights under the ADA when they failed to engage him in an interactive process and or

otherwise interfered with his attempts to seek reasonable accommodations for his disabilities. (SAC ¶ 62).  As a result of this discrimination, Marsh has suffered and will continue to suffer a substantial loss of earnings, including, but not limited to, loss of salary, bonuses, benefits, health insurance, life insurance, and other emoluments of employment. (SAC ¶ 63).  As a further direct and proximate cause of the U.S. Steel Companies' discrimination, Marsh alleges his reputation and career have been damaged. Marsh has also experienced physical pain and suffering, and severe emotional distress, including anxiety, post-traumatic stress disorder, and depression. (SAC ¶ 64).

On July 23, 2019, Marsh filed a Charge of Discrimination against the U.S. Steel Companies with the Equal Employment Opportunity Commission ("EEOC"), alleging age and disability discrimination. (SAC ¶ 65).  Marsh's Charge was dual-filed with the Pennsylvania Human Relations Commission ("PHRC"). (SAC ¶ 66).  By letter dated April 30, 2020, the EEOC notified Marsh of his right to file a civil action against the U.S. Steel Companies. (SAC ¶ 67).

## II.     Legal Standard

A court must grant a motion to dismiss under Rule 12(b)(1) if it determines that it lacks subject matter jurisdiction over a claim. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). "Generally, where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *The Connelly Firm, P.C. v. U.S. Dep't of the Treasury*, No. 15-2695, 2016 WL 1559299, at *2 (D. N.J. Apr. 18, 2016) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)).

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-

pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.*  (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

"[A]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  *Id.* (internal quotation omitted).

### III.   Discussion

The U.S. Steel Companies seek dismissal of the Second Amended Complaint on numerous grounds, which, in large part, repeat those arguments made in support of their motion to dismiss the FAC.  We will address those arguments *seriatim*.

### A. Transtar and U.S. Steel: "Employers" under the ADEA, ADA and PHRA

At Count I Plaintiff alleges violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"), against U.S. Steel, Transtar and the Railroad. Defendants argue Plaintiff was employed by the Railroad and cannot maintain his claims against companies that did not employ him, i.e. Transtar and USS.  Under the ADEA, only employers may be held liable.  29 U.S.C. § 623*; Lewis v. Vollmer of America*, No. 05-1632, 2008 WL 355607, *1 (W.D. Pa. Feb. 7, 2008).   Under the ADA, liability can only be imposed on employers. 42 U.S.C. § 12112. The ADA definition of "employer" states an employer is "a person engaged in an industry affecting commerce who has 15 or more employees for each working day ..." 42 U.S.C. § 12111(5)(A). The definition of an "employee" is "an individual employed by an employer." 42 U.S.C. § 12111(4). Consequently, courts have relied on common law agency principles to determine employer-employee relationships under the ADA. *See EEOC v. Zippo Mfg. Co*., 713 F.2d 32, 38 (3d Cir.1983).

The SAC alleges the Railroad was Plaintiff's "direct" employer, (SAC ¶¶ 2, 46), the Railroad is a wholly owned subsidiary of Transtar, an entity engaged in the business of transporting raw materials and finished products for a variety of industries, (SAC ¶ 14, 15), and the Railroad and Transtar are wholly owned subsidiaries of and operate in concert with U.S. Steel.  (SAC ¶ 14).

Plaintiff, citing portions of the SAC, argues we should apply a "joint employer" analysis, *see* ECF No. 62 at 11-13.  The bulk of the allegations he argues support such a theory were previously set forth in the First Amended Complaint in this case, which we held were insufficient to state a claim.  For example, as before, he has alleged U.S. Steel and Transtar directly manage and control the terms and conditions of Union Railroad employees through executives like Carnes and Sommers, each of whom held job titles which reflected the integrated nature of Union Railroad's operations with both Transtar and U.S. Steel.  (SAC ¶ 16).  He again alleges U.S. Steel and Transtar jointly control the terms and conditions of employment of Union Railroad employees as Union Railroad is an entity that was created to benefit and support Transtar's and U.S. Steel's operations. (SAC ¶ 17).   In granting the Motion to Dismiss the FAC, we explained:

> In *Lewis v. Vollmer of Am.*, No. CIV. A. 05-1632, 2008 WL 355607, at *2-3 (W.D. Pa. Feb. 7, 2008), the Court granted a motion to dismiss filed by defendant Wollmer Werke, an alleged employer of a plaintiff alleging national origin and age discrimination. Defendant moved to dismiss on the grounds it was not plaintiff's employee, but rather, plaintiff was employed by its subsidiary. The Court held:
>
>> It is undisputed that under Title VII, the ADEA and the PHRA only employers may be held liable for acts of discrimination. 42 U.S.C. § 2000e-2; 29 U.S.C. § 623; 43 P.S. § 959. Werke argues that because it was not plaintiff's employer at any time relevant to the complaint, it cannot be held liable for any of plaintiff's claims. . . . the fact that Werke and [the subsidiary] communicate with each other about products and customer needs does not appear particularly significant. . . . Thus, while these exhibits may demonstrate that the two companies interact with each other, they do not show, as plaintiff has suggested, that the two companies are so intertwined in their activities, labor relations and management that they are, in essence, a single employer.

(ECF No. 53 at 23).

In an attempt to cure prior deficiencies noted in our earlier decision, Plaintiff has alleged in the SAC that U.S.S. and Transtar had authority to hire and fire employees of the Railroad, and they also promulgate work rules and assignments and set conditions of employment at the

Railroad.   (SAC ¶¶ 17, 30-31).   Plaintiff alleges that "U.S. Steel and Transtar acted as joint employers of Marsh," (SAC ¶ 72), and that Transtar issued "system order and work-related rules, regulations, and protocol and issued or managed benefits programs which were available to Railroad employees. (SAC ¶¶ 73, 78).   With respect to U.S. Steel, Plaintiff alleges that "Transtar, U.S. Steel and Union Railroad worked closely together to draft, implement, and enforce the demerits policy at issue." (SAC ¶ 77).   At the same time, Plaintiff alleges he was hired by the Railroad (SAC ¶ 46), promoted by the Railroad (SAC ¶ 48), the Railroad cited him for safety violation (SAC ¶ 52)m and was terminated by the Railroad (SAC ¶ 57).

These additional allegations meet the threshold requirement of alleging liability on the part of Transtar and U.S. Steel under a joint employer theory. In *Washington v. Client Network Servs. Inc*., 590 F. App'x 126, 130 (3d Cir. 2014), the court explained:

>  Whether Washington was employed by Amtrak as well as CNSI for these purposes turns on a number of factors, including Amtrak's level of control over Washington, which entity hired and paid him, and which entity generally controlled his day-to-day activities. *See Covington [v. Int'l Ass'n of Approved Basketballl Officials]*, 710 F.3d at 119 [3d Cir. 2013], (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)). Under this standard, "the precise contours of an employment relationship can only be established by a careful factual inquiry," *Graves [v. Lowery]* , 117 F.3d [723] at 729 [3d Cir. 1997], and the issue thus "may generally require resolution at the summary judgment stage, rather than at the motion to dismiss stage," *Mariotti v. Mariotti Bldg. Prods., Inc*., 714 F.3d 761, 768 n. 5 (3d Cir.2013), cert. denied, —— U.S. ——, 134 S.Ct. 437, 187 L.Ed.2d 284 (2013).

Because the nature of the employment relationship requires a more in-depth factual inquiry, and while the Court reserves judgment as to whether any discovery would support this theory,[3] at this juncture we hold that, in the absence of dismissal on other grounds, the motion to dismiss should be denied as to the claims against Transtar and U.S. Steel.

---

[3] A parent corporation generally is not liable for the wrongful acts of its subsidiaries simply because the parent wholly owns the subsidiary. *Jean Anderson Hierarchy of Agents v. Allstate Ins. Co*., 2 F.Supp.2d 688, 691 (E.D.Pa.1998); *see also Martin v. Safeguard Scientifics, Inc*., 17 F.Supp.2d 357, 363 (E.D.Pa.1998) (noting strong presumption that parent is not employer of subsidiary employee). Accordingly, the mere fact that one company is a

**B.  Failure to Plead Claims with Specificity: Fed. R. Civ. P. 12 (b)(6)**

Defendants argue that Plaintiff has not adequately plead any of his claims against them, specifically as to the allegations of violations of the ADEA, the ADA, and the PHRA. Although the Court has held that Transtar and U.S. Steel are not joint employers under the applicable statutes, out of an abundance of caution, we will address these arguments.

### 1. ADEA

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Keller v. Orix Credit All., Inc*., 130 F.3d 1101, 1108 (3d Cir.1997) (reaffirming the application of a "slightly modified version of [*McDonnell Douglas*] in ADEA cases").

Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Keller*, 130 F.3d at 1108 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Satisfying the prima facie elements creates an "inference of unlawful discrimination." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir.1999) (quoting *Waldron v. SL Indus., Inc*., 56 F.3d 491, 494 (3d Cir.1995)). The elements of a prima facie case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the

---

wholly-owned subsidiary of another is insufficient to establish that they are a single employer. See *Marzano v. Computer Science Corp. Inc*., 91 F.3d 497, 514 (3d Cir.1996) (dismissing claims against parent corporation for lack of evidence of parent's involvement in management of personnel decisions).

position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir.2013).

Plaintiff need not establish a prima facie case of discrimination at this stage, as "[a] prima facie case is 'an evidentiary standard, not a pleading requirement.'" *Connelly v. Lane Const. Corp.,* 809 F.3d 780, 789 (3d Cir. 2016) (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002). Rather, Plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* However, the Court will use the elements of a prima facie claim for ADEA discrimination as a guideline in evaluating the claim at this stage. *See Dreibelbis v. County of Berks*, 2020 WL 605884 at *7 (E.D. Pa. Feb. 7, 2020).

To succeed on a disparate treatment claim, a plaintiff must demonstrate "the employee's protected trait actually played a role" and "had a determinative influence on the outcome" of the decisionmaking process that led to the challenged action. *Hazen Paper v. Biggins*, 507 U.S. 604, 610 (1993); *see* 29 U.S.C. § 623(a) ("It shall be unlawful for an employer ... [to] discriminate against any individual ... *because of* such individual's age ...." (emphasis added)). In other words, age must have been a "but-for" cause of the action, and the plaintiff bears the burden of proving so. *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Accordingly, "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Hazen Paper*, 507 U.S. at 609, 113 S.Ct. 1701. The Supreme Court has distinguished between age and years of service, concluding that "it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* at 611, 113 S.Ct. 1701; *see also Tomasso v. Boeing Co.*, 445 F.3d 702, 710 n.8 (3d Cir. 2006) (finding a decision to reduce layoff protection for employees based on years of service

did not equate to age-based discrimination). Termination based solely on financial considerations related to years of service is not actionable under the ADEA. *See id*. at 612–13, 113 S.Ct. 1701. And although an employer may not use a direct proxy for age to discriminate surreptitiously against older workers, an employee's tenure (without more) is not such a direct proxy. *See id*. at 611–13, 113 S.Ct. 1701; *cf. Erie Cty. Retirees Ass'n v. Cty. of Erie*, 220 F.3d 193, 211 (3d Cir. 2000) (recognizing Medicare eligibility as a proxy for age because it necessarily follows turning 65).

Against this backdrop we consider Plaintiff's allegations.  He alleges that "[b]eginning in or about May 2012, the U.S. Steel Companies, led by Sommers, Carnes, and Hudson, began manipulating the demerits policy to ensure that Plaintiff and other Senior Employees could be fired for cause. (SAC ¶ 30).  At the outset we note that one of the ways that the U.S. Steel Companies targeted the Senior Employees was through the use of "last chance" agreements the company had historically used to informally manage disciplinary action for employees with substance abuse problems. (SAC ¶ 31). However, Marsh does not allege that he himself was subject to a last chance agreement.   We take judicial notice of the fact that Marsh's discipline and termination by URR is the subject of National Railroad Adjustment Board (First Division) ("NRAB") arbitration proceedings, at case no. NRAB-00001-100103, and further, the union which represented him at the grievance proceedings is no longer a defendant in this case. (Stip. of Dismissal of Smart Transportation Division, dated November 5, 2021, ECF No. 57).

Plaintiff alleges that "in or about May 2012, Defendants, led by the Railroad General Superintendent, Joel Hudson, U.S. Steel General Manager, Jonathan Carnes, U.S. Steel Managing Director, Malisa Sommers, initiated a pretextual scheme to terminate Railroad employees who they believed *were too costly to continue employing due to, among other things,*

*their age, i.e. over the age of 40*."   (SAC ¶ 18).  He further alleges that "[u]pon information and belief, the U.S. Steel Companies instituted *these and other cost-cutting measures as part of a company-wide effort to enhance the bottom line of the U.S. Steel Companies*." (SAC ¶ 19).

The Supreme Court has stated "[e]ven if the motivating factor is correlated with age," the evils the ADEA seeks to combat—"the problem of inaccurate and stigmatizing stereotypes"—are not present "[w]hen the employer's decision is wholly motivated by factors other than age." *Hazen*, 507 U.S. at 610–11. To state a valid ADEA claim, Marsh must allege some facts showing that his age was a determining factor in Defendant's decision to terminate him. *Broaddus*, 145 F.3d at 1287. He does not, however, provide any factual basis for his assertion that his age was a motivating factor in Defendant's decision, separate from any correlation his age may have with his benefits and cost-cutting goals derived therefrom.

The allegations in the Second Amended Complaint include:

> Marsh's younger co-workers (i.e., under 40 years old at the time), including but not limited to Ricky Seibel, committed similar red zone violations, and were not punished as severely. In fact, in some cases, including but not limited to Ricky Seibel, Marsh's younger co-workers were not punished at all.

SAC ¶ 86.  This does not suffice.  *See also Drummer v. Trustees of Univ. of Pa*., 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017) (granting motion to dismiss ADEA claim and holding that a "bare assertion that [plaintiff] was replaced by a younger [employee] does not raise his claim above the level of mere speculation").  Plaintiff does not allege any non-conclusory facts to show that his age "actually motivated the employer's decision" *to terminate him. Hazen,* 507 U.S. at 610. Plaintiff has provided no facts to plausibly show that "the circumstances of the adverse employment action give rise to an inference of age discrimination." *Howell*, 283 F. Supp. 3d at 325 (quoting *Mayk,* 2010 WL 1141266, at *5). Nor has Plaintiff alleged any facts

plausibly allowing the Court to draw the reasonable inference that Defendant's reasons for terminating Plaintiff are "more likely than not based on the consideration of impermissible factors." *Willis*, 808 F.3d at 644 (quoting *Pivirotto,* 191 F.3d at 352). As Plaintiff failed to allege any non-conclusory facts that raise a reasonable expectation that discovery will uncover proof that Plaintiff's age motivated Defendant's decision to terminate Plaintiff, Plaintiff's ADEA claim is dismissed without prejudice for failure to state a claim.

Overall, the ADEA claim is speculative and lacks the requisite particularity such that it is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), *Twombly* and *Iqbal.*

Accordingly, the motion to dismiss will be granted with respect to the ADEA claim.

### 2. ADA

The ADA prohibits covered entities from discriminating against qualified individuals on the basis of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Techs., Inc.,* 134 F.3d 576, 580 (3d Cir. 1998), citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996). To establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997).

16

Defendants argue that Plaintiff has failed to state a claim because he has not alleged that he is disabled within the meaning of the ADA. The ADA defines a qualifying disability as 'a physical or mental impairment that substantially limits one or more of [the employee's] major life activities.'" *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp.3d 585, 592 (E.D. Pa. 2017) (quoting 42 U.S.C. § 12102(1)(a); citing *Amiot v. Kemper Ins. Co.,* 122 F. Appx. 577, 580 (3d Cir. 2004)).  For the purposes of § 12102(1)(A), "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). This standard requires Plaintiff to include "a 'short and plain statement of the impact the impairment has on at least one major life activity.'" *Feliciano*, 281 F. Supp. 3d at 592.

Section 12102(4)(A) further provides that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). "The relevant inquiry remains whether the impairment 'substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013), *aff'd,* 582 F. App'x 114 (3d Cir. 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). Furthermore, it is "an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability." *Jones v. United Parcel Serv*., 214 F.3d 402, 406 (3d Cir. 2000).

Plaintiff alleges that he suffers from arthritis, gastritis, and irritable bowel syndrome (SAC ¶¶ 50, 51 92), without any specific explanation or description of how said conditions may substantially limit a major life activity, and/or limit his ability to work. Nor does he plead any

facts to support a possible causal connection between a disability and adverse employment action, i.e. his termination, a failure to accommodate, or retaliation. While Plaintiff's termination constitutes an adverse employment action for the purposes of his ADA discrimination claim, Plaintiff fails to state any well-pleaded allegations that would allow the Court to draw the reasonable inference that his termination was the result of his alleged disability. He states summarily that he was subject to harassing[4] and retaliatory behavior at work whenever he sought accommodations. Without additional, non-conclusory factual content, the allegations in the SAC do not plausibly suggest that Plaintiff "suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000), (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

As Plaintiff fails to allege sufficient facts to raise a reasonable expectation that discovery will uncover proof that Plaintiff's disability may be sufficiently debilitating, or that his termination was the result of his alleged disability, or that defendant was asked to accommodate or assist Marsh and did not make a good faith effort to do so, the Court dismisses Plaintiff's ADA claim with prejudice for failure to state a claim.

Accordingly, the motion to dismiss will be granted as to the ADA claim at Count II.

---

[4] A claim for a hostile work environment requires a showing that the plaintiff is a qualified individual with a disability; the plaintiff was subject to unwelcome harassment; the harassment was based on the plaintiff's disability or request for an accommodation; the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and to create an abusive or hostile working environment; and that the employer knew or should have known of the harassment and failed to take prompt effective remedial action. S*ee Frost v. City of Phila.*, 839 Fed. App'x 752, 758 (3d Cir. 2021); *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999). To the extent Marsh alleges such a claim, we conclude he has not plausibly plead a claim for hostile work environment because Defendant's alleged conduct is not objectively hostile or abusive. Taking all the allegations in the SAC as true, the allegations do not constitute a claim for hostile work environment. The alleged conduct is not sufficiently severe or pervasive.

### 3. Count III: PHRA Violations as to All Defendants

Plaintiff's PHRA claim refers to the acts and omissions by the Individual Defendants and the U.S. Steel Companies, alleging they fired him because he was 57 years old.  (SAC ¶ 112). He alleges that "the acts and omissions by the [U.S. Steel Companies] . . .  were only possible because of the roles that Hudson, Carnes, and Sommers played in creating and implementing policies to be used in discriminatory ways."  (SAC ¶113). He further alleges the Individual Defendants carried out the targeting of specific categories of employees to ensure that the cost-cutting measures that were being implemented throughout the U.S. Steel Companies were carried out successfully at the Railroad. (SAC ¶ 114).

For the same reasons discussed *supra*, these allegations fail to meet the pleading standard enounced in *Twombly* and *Iqbal.* The PHRA provides: "[i]t shall be an unlawful discriminatory practice ... [f]or any employer because of the ... age ... of any individual ... to otherwise discriminat[e] against such individual ... with respect to compensation, hire, tenure ... if the individual ... is the best able and most competent to perform the services required." 43 Pa. Stat. Ann. § 955(a). "To prevail on a claim of intentional discrimination under the ADEA or the PHRA, "a plaintiff must show that his or her age 'actually motivated' or 'had a determinative influence on' the employer's decision to fire him or her.'" *Fakete v. Aetna, Inc*., 308 F.3d 335, 337 (3d Cir. 2002) (quotations omitted).  "The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively." *Kautz v. Met–Pro Corp*., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

Similarly, both the ADA and PHRA provide that employers may not discriminate against employees because of disability. 42 U.S.C. § 12112(a); 43 PA. STAT. ANN. § 955. In both federal and Pennsylvania courts, a plaintiff's claims under the ADA and PHRA are treated as

coextensive. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). In addition, the PHRA's definition of disability is coextensive with the definition of disability under the ADA. *Id.*

Therefore, to the extent Marsh alleges violations of the PHRA on the basis of his alleged disability and on the basis of his age, the court will interpret plaintiff's PHRA claim consistent with courts' interpretation of such claims under the ADEA and ADA.  They amount to mere conclusory allegations, wholly lacking in any factual specificity as to state claims that are facially plausible.

For these reasons the motion to dismiss will be granted with respect to the PHRA claim.

### C.  Leave to Amend

As set forth *supra*, the Second Amended Complaint lacks specificity in numerous respects.  Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is served." A motion to dismiss for failure to state a claim must be made "before pleading if a further pleading is permitted." Fed. R. Civ. P. 12(b). Thus, in the typical case in which a defendant asserts the defense of failure to state a claim by motion, the plaintiff may amend the complaint once "as a matter of course" without leave of court. See 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[5], at 12–76 (3d ed.1999) (quoting Fed. R. Civ. P. 15(a)).

After amending once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court has instructed that although "the grant or denial of an opportunity to amend is within the discretion of the District Court, ... outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of

the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

"Among the grounds that could justify a denial of leave to amend are undue delay, bad faith,

dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d

1410, 1434 (3d Cir.1997); *Lorenz v. CSX Corp*., 1 F.3d 1406, 1413–14 (3d Cir. 1993). "Futility"

means that the complaint, as amended, would fail to state a claim upon which relief could be

granted. *Burlington*, 114 F.3d at 1434. In assessing "futility," the District Court applies the same

standard of legal sufficiency as applies under Rule 12(b)(6). *Id*.; 3 Moore's Federal Practice,

supra § 15.15[3], at 15–47 to –48 (3d ed. 2000).

Plaintiff filed his first Complaint on July 30, 2020, and after motions to dismiss were

filed, filed his FAC on October 19, 2020 (ECF No. 26). The Court granted the motion to dismiss

the FAC on September 29, 2021, after which Plaintiff filed the SAC. (ECF No. 55).  In addition,

we note that the SAC continues to carry over and include numerous paragraphs from pleadings

in *Marsh and Stouffer v. Union Railroad Company, LLC, et al.,* No. 2:20-cv-00133-RJC (W.D.

Pa.), dismissed and now on appeal. Given the repeated attempts to cure, and the futility should

amendment be permitted, the SAC is dismissed with prejudice.

## IV. Conclusion

For the reasons discussed above, the Court will grant the motion to dismiss by the

Defendants, all with prejudice.  An appropriate Order of Court follows.

BY THE COURT:


s/*Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: September 12, 2022

cc/ecf: All counsel of record

21